**TEXPORTS STEVEDORE COMPANY and Texas Employers' Insurance Association, Petitioners,**

v.

**Murl J. WINCHESTER and Director, Office of Workers' Compensation Programs, U.S. Department of Labor, Respondents.**

No. 76–4100.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1980.

E. D. Vickery, W. Robins Brice, Houston, Tex., for petitioners.

Ronald E. Meisburg, Joshua T. Gillelan, II, Attys., Dept. of Labor, Washington, D. C., for respondents.

Before COLEMAN, Chief Judge, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges.*

FAY, Circuit Judge:

We granted the petition for rehearing, 5th Cir., 569 F.2d 428, to reconsider the definition of an "adjoining area" or maritime situs under 33 U.S.C. § 903(a) (1976) of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. The prior decisions, 5th Cir., 554 F.2d 245; 5th Cir., 561 F.2d 1213, finding that the claimant was injured at a maritime situs are affirmed.

## I. FACTS AND PROCEEDINGS

Respondent Murl J. Winchester was a Longshoreman employed as a "gear man" by petitioner Texports Stevedore Company. Texports maintained three "gear rooms," or facilities for the storage and maintenance of gear,[1] in the vicinity of the Houston

---

* Judges John R. Brown and Jerre S. Williams took no part in the decision of this case.

1. "'Gear' includes such things as spreader bars, pallets, wire cable slings, tow motors, forklifts, etc. It is the equipment used by stevedores to perform the loading operation."

Shipping Channel Docks.[2] All three gear rooms were supervised by the same shop foreman. Two of the gear rooms were on the docks. Because those gear areas could not be expanded, and because the docks had insufficient space for an additional gear room, Texports' third gear room is on Avenue N, five blocks from the gate of the nearest dock. This third gear room is as close as Texports could get to the docks. Port Authority property extends to within about a half block from the gear room. Other Houston stevedores also must locate gear rooms outside the docks' gates.[3]

Winchester would report to the Avenue N gear room where he was given his daily work assignment. His duties as a gear man included supplying and repairing the tools and machinery used by stevedores in loading and unloading ships. His work was performed at the dockside, on board ships, and at each of the gear rooms, including those of other stevedores. When Texports was loading and unloading cargo, Winchester would service several ships, travelling over the public streets connecting the gear rooms and docks. Even when Texports had no ships to load or unload, the gear rooms operated repairing and maintaining gear for the next loading and unloading operation.

On June 3, 1974, while in the course of his employment for Texports, Winchester tripped and fell against a forklift at the Avenue N gear room, striking his face. Winchester filed a claim for compensation for serious facial disfigurement under the Longshoremen's and Harbor Workers' Compensation Act (LHWA). The Administrative Law Judge (ALJ) denied his disfigurement claim, but held Texports liable for Winchester's medical expenses and attorney's fees. Decision and Order of ALJ, App. at 9–21.

On appeal by petitioners, the Benefits Review Board (the Board) affirmed the Administrative Law Judge's decision. The LHWA's two–pronged test for coverage requires the injured claimant to have been an "employee" engaged in maritime employment[4] at a situs specified in the Act.[5] The Board held that Winchester was an "employee" injured in an area under the LHWA. Decision of the Benefits Review Board, App. at 1–6, *reprinted in Winchester v. Texports Stevedore Co.*, 4 B.R.B.S. 447, 449–51 (1976). As to the situs, the Board stated:

> [A]n adjoining area must be deemed bounded only by its use as a maritime enterprise. *Maxin v. Dravo Corp.*, 2 B.R.B.S. 372 [(1975), aff'd, 545 F.2d 374 (3d Cir. 1976)]. The Avenue N gear room although five blocks from any wharf was placed in a location that would provide easy access for the gear men to service vessels on both sides of the channel. It clearly played an integral part in employer's overall maritime enterprise thereby

---

Decision and Order of Administrative Law Judge, App. at 11.

**2.** The record has conflicting testimony on whether Texports had three gear rooms or two gear rooms and two lockers. Texports had gear at City Docks No. 43, 45, and 27, and at the Avenue N location. The Benefits Review Board and ALJ state there were three gear rooms. *Winchester v. Texports Stevedore Co.*, 4 B.R.B.S. 447, 448 (1976); Decision and Order of Administrative Law Judge, App. at 11–12.

**3.** *See* Appendix I, and exhibit not available to the ALJ but supplied by petitioners on rehearing en banc.

**4.** When used in this chapter—

    (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person en-

gaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

33 U.S.C. § 902(3) (1976).

**5.** Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 903(a) (1976).

qualifying as an adjoining area under the Act.

.     .     .     .     .

Further, the 1972 amendments to the Act were enacted in part to eliminate the circumstance of having persons engaged in maritime employment walk in and out of coverage during the workday. *Stockman v. John T. Clark & Son of Boston, Inc.,* [539 F.2d 264, 274 (1st Cir. 1976)]; *Dellaventura v. Pittston Stevedoring Corp.* [*Pittson Stevedoring Corp. v. Dellaventura* ], [544 F.2d 35, 54 (2d Cir. 1976)]. A narrow reading of the situs requirement in the instant case would be contrary to this purpose of the Act.

*Id.* at 4–5; B.R.B.S. at 450–51.

A panel of this court affirmed the Board. *Texports Stevedore Co. Winchester,* 554 F.2d 245, *as modified,* 561 F.2d 1213 (1977). After noting the policy of liberal construction, the presumption of coverage, and the scope of review of Board decisions, the panel held that the Board properly determined that Winchester was an "employee." *Id.* at 247.[6] Turning to the gear room, the panel held that it was a maritime situs:

> Respondent's accident did not occur on the dock or pier adjoining the Houston Shipping Channel but at a gear room which, though five blocks away, adjoined the docks and associated buildings. See *Alabama Dry Dock and Ship Building Co. v. Kininess,* 554 F.2d 176, 178 (5th Cir. 1977).

561 F.2d at 1213.[7]

On petition for rehearing en banc, petitioners argue that the panel's assertion that the gear room "adjoined the docks and associated buildings" is factually inaccurate. Furthermore, they argue that the panel ignored the statute's requirement that the situs adjoin "navigable waters," not just a facility that in turn is next to water. Petitioners also assert that the panel opinion is inconsistent with two prior opinions of this court, *Alabama Dry Dock & Shipbuilding Co. v. Kininess,* 554 F.2d 176 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) and *Jacksonville Shipyards, Inc. v. Perdue,* 539 F.2d 533 (5th Cir. 1976).

The case was reargued before the en banc panel in June, 1980. In its supplemental brief, petitioners assert that the *Alabama Dry Dock* test provides certainty of coverage while meeting the congressional objective of expanding coverage. Petitioners also claim that the legislative history supports restricting situs to facilities strictly "contiguous" to "navigable waters."

Although we recognize the merit of some of petitioners' positions, we decline their invitation to constrict the broadened coverage of the LHWA by corseting the areas eligible as maritime situses.

## II. THE 1972 AMENDMENTS TO THE LHWA

In 1917, the Supreme Court held that maritime employees injured seaward of the water's edge could not be covered by state workers' compensation schemes. *Southern*

---

**6.** On the day of the injury Texports was not loading or unloading vessels. The Board held nevertheless that Winchester was an "employee" because his activities as a gear man were an integral part of an overall, continuing longshoring operation. *Winchester v. Texports Stevedore Co.,* 4 B.R.B.S. 447, 449 (1976). The Supreme Court has confirmed that "maritime employment" may include jobs with duties carried out solely on land. *P. C. Pfeiffer Co., Inc. v. Ford,* 444 U.S. 69, 76–80, 100 S.Ct. 328, 334–336, 62 L.Ed.2d 225 (1979).

**7.** The language in the original panel opinion, which was withdrawn and modified as it appears above, was as follows:

> Respondent's accident did not occur on the dock or pier adjoining the Houston Shipping Channel but at a gear room several blocks away. Bearing in mind the test expounded by Judge Tjoflat in *Perdue,* it is clear that the N Avenue gear room, housing the gear used in loading and unloading cargo from ships, was a situs customarily used for maritime purposes as provided by the statute. Acknowledging the distance from the gear room to the water, we cannot, after giving the Act a liberal construction, reverse respondent's coverage just because the harbor area provided inadequate facilities for Texports to house their equipment.
> 554 F.2d at 247.

Pacific Co. v. Jensen, 244 U.S. 205, 214–18, 37 S.Ct. 524, 528–529, 61 L.Ed. 1086 (1917). Although later cases softened the *Jensen* line, this ruling left many longshoremen injured over water without a compensation remedy. *See Sun Ship, Inc. v. Pennsylvania*, —— U.S. ——, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980). To fill the gap left by *Jensen*, Congress enacted the 1927 LHWA to cover injuries occurring "upon the navigable waters." Although Congress constitutionally had the power to compensate maritime injuries occurring on land, the Court limited the LHWA's scope by interpreting the waterline to be its point of cleavage. *Nacirema Operating Co., Inc. v. Johnson*, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). In general, longshoremen's injuries on land were covered by state law and those over water were covered by federal law.

Congress later attempted a general overhaul of the LHWA which resulted in the 1972 amendments to the statute. One major change was an increase in federal benefits. This increase, however, created quite a disparity between the federal benefits and many states' compensation benefits. H.Rep.No.92–1441, 92d Cong., 2d Sess. 10–11 (1972) and S.Rep.No.92–1125, 92d Cong., 2d Sess. 12–13 (1972), *reprinted in* [1972] U.S. Code Cong. & Ad. News pp., 4698, 4707–08 (hereinafter H.Rep.).[8] Besides this

---

**8.** The House and Senate Committee Reports contain identical language on the broadening of LHWA jurisdiction under the 1972 amendments, which reads in full as follows:

EXTENSION OF COVERAGE TO SHORE-SIDE AREAS

The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur "upon the navigable waters of the United States." Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.

To make matters worse, most State Workmen's Compensation laws provide benefits which are inadequate; even the better State laws generally come nowhere close to meeting the National Commission on State Workmen's Compensation Laws recommended standard of a maximum limit on benefits of not less than 200% of statewide average weekly wages. The following are the maximum limits on the compensation payable for permanent total disability in some maritime States:

| | |
|---|---|
| California | $70.00 |
| Florida | 56.00 |
| Hawaii | 112.50 |
| Louisiana | 49.00 |
| Maryland | 85.68 |
| Massachusetts | [1] 77.00 |
| New Jersey | 101.00 |
| New York | 80.00 |
| Oregon | 62.50 |
| Pennsylvania | 60.00 |
| Texas | 49.00 |

[1] Plus $6 for each dependent.

Also, under the laws of some states due to exemptions based upon the number of employees hired some workers might be uncovered in the event they are unfortunate victims of an injury.

It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo–handling techniques, such as containerization and the use of LASH–type vessels, more of the longshoreman's work is performed on land than heretofore.

The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.

The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the

**510**

general disparity, many states supplied what Congress considered to be totally inadequate benefits. H.Rep. at 10. As the LHWA stood, the amount of benefits received depended upon "the fortuitous circumstance of whether the injury occurred on land or over water." *Id.* Technology had heightened this factor of chance by enabling much of the work traditionally handled over water to be moved on shore. *Id.* Many longshoremen moved continually from shore to sea, in and out of state and federal coverage, during the day.

█ To effectuate a uniform compensation system for those who would be covered by the LHWA for part of their activity, Congress moved the jurisdictional line landward to cover

> an injury occurring upon the navigable waters of the United States (including any adjoining pier, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 903(a) (1976); H.Rep. at 11. Congress did not, however, intend to cover all people who happened into a maritime area. H.Rep. at 11. Congress therefore added a status requirement so that the LHWA would cover only persons "engaged in maritime employment." 33 U.S.C. § 902(3) (1976). The 1927 LHWA contained only a water's–edge situs test for jurisdiction. The 1972 amendments created a two–

prong test covering a broader area but requiring a connection to maritime employment.

## III. *CAPUTO AND PFEIFFER*

The Supreme Court has addressed the LHWA's expanded coverage twice since the 1972 amendments, but neither opinion tangles with the thornier problems of the new situs test. The cases do impart, however, the proper approach to resolving the problems: "The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage." *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977) (hereinafter *Caputo*). In *Caputo*, the Court rejected the "point of rest" theory and held that a checker and terminal laborer were employees engaged in maritime employment under the LHWA. One employee was injured in a terminal area which his employer conceded was a maritime situs. The other employee was injured on one of two "finger–piers" at a fenced–in facility on the water. Although one pier was used for loading and unloading, since the employee was injured at the pier used only for stripping and stuffing containers, the employer argued that the pier was not a situs "customarily used by an employer in loading [and] unloading...." The Court began by expressing doubt that the phrase "customarily used" in the LHWA modified "pier" as

---

pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or- building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans–shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage

under the Act to individuals who are not employed by a person who is an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters.
H.Rep.No.92–1441, 92d Cong., 2d Sess. 10–11 (1972); S.Rep.No.92–1125, 92d Cong., 2d Sess. 12–13 (1972), *reprinted in* [1972] U.S. Code Cong. & Ad. News 4698, 4707–08. In addition, the Senate Report states in its summary:
The bill also expands coverage of this Act to cover injuries occurring in the contiguous dock area related to longshore and ship repair work.
S.Rep.No.92–1125, 92d Cong., 2d Sess. 2 (1972).

well as "other adjoining area." The Court held that even if the phrase did modify the preceding terms the pier was part of a "terminal" which was customarily used for loading and unloading.

■ In *P. C. Pfeiffer Co., Inc. v. Ford*, the Court refused to define "maritime employment" as requiring that the employee could, at some time during the day of injury, have been assigned to work upon the navigable waters. 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (hereinafter *Pfeiffer*). In rejecting the argument that "maritime employment" had a geographic component, the Court noted that geography does play a role in the situs test and in the definition of "employer," 33 U.S.C. § 902(4) (1976).[9] These features and the legislative history caused the Court to conclude that "maritime employment" focuses on the employee's occupation, not his potential location. The inquiry is whether the claimant is engaged in or spends some of his time in activities traditionally performed by longshoremen. 444 U.S. at 80 & n.18, 100 S.Ct. at 336 & n.18. Union jurisdiction and the employer's whim are not definitive on whether activities are "maritime employment." The Court concluded that its interpretation served the congressional purposes of expanding coverage, applying uniform standards, covering on–shore maritime

duties, and reducing the number of employees walking in and out of coverage without granting LHWA coverage to all those within the situs area.

## IV. FIFTH CIRCUIT PRECEDENT

In *Caputo* and *Pfeiffer*, the employees were all injured in one of the seven specific places listed in section 903(a): upon the navigable waters, or at an adjoining pier, wharf, dry dock, terminal, building way, or marine railway. Winchester's injury, however, did not occur at one of these sites. To be covered, his injury must have occurred at the section's general situs, an "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel."

Prior to this case, this court had interpreted "other adjoining area" in two opinions. *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533 (5th Cir. 1976) (*Jacksonville Shipyards*), reviewed the decisions on five claimants.[10] The panel began its discussion of situs by stating it would look past the nomenclature of an employer or local custom and examine the facts to determine whether a situs is actually one "customarily used by an employer in loading, unloading, repairing, or building a vessel."[11] In one of the cases, *Ford*, the par-

9. A statutory employer is
   an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
   33 U.S.C. § 902(4) (1976).

10. The five cases are *Jacksonville Shipyards, Inc. v. Perdue*, No. 75–1659, *vacated and remanded*, 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), *aff'd on remand*, 575 F.2d 79 (5th Cir. 1978), *cert. denied*, 440 U.S. 967, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979) (Blackmun, J., dissenting) *(Perdue); Jacksonville Shipyards, Inc. v. Skipper*, No. 75–2833 *(Skipper); P. C. Pfeiffer Co., Inc. v. Ford*, No. 75–2289, *vacated and remanded*, 433 U.S. 904, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977), *aff'd on remand*, 575 F.2d 79 (5th Cir. 1978) *aff'd*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) *(Ford); Halter Marine Fabricators, Inc. v. Nulty*, No. 75–2317,

*cert. denied*, 433 U.S. 908, 97 S.Ct. 2793, 53 L.Ed.2d 1092 (1977) *(Nulty); Ayers Steamship Co. v. Bryant*, No. 75–4112, *vacated and remanded*, 433 U.S. 904 (1977), *aff'd on remand*, 575 F.2d 79 (5th Cir. 1978), *aff'd sub nom. P. C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) *(Bryant)*.

11. Two other characteristics of maritime situs listed by the panel are called into question after *Caputo* and *Pfeiffer*. The panel indicated that all sites must be "customarily used" for maritime purposes, but the Supreme Court has expressed doubt over whether the "customarily used" language applies to the seven specific sites as well as the general one. *Caputo*, 432 U.S. at 280, 97 S.Ct. at 2365. Because "other adjoining areas" must clearly be "customarily used" we do not opine on the reach of this modifier. The panel also stated, "As with the 'maritime employment' test, we also interpret the Act as requiring that the situs meet the statutory requirements as of the time of the injury," not at some past or contemplated fu-

ties conceded the situs question. 539 F.2d at 543. In *Nulty*, the employee was a carpenter at a shipyard injured at a "fabrication ship [*sic*–shop?]" three hundred feet from the new ship on which he was working. The panel did not discuss the application of the situs test. *Id.* at 543–44. In *Bryant*, the panel held that a pier–side warehouse used for temporary storage of cargo before loading was a situs under section 903(a). *Id.* at 544. In *Skipper*, the panel decided that a ship repairer assigned to dismantle a building at an abandoned marine shipbuilding facility was neither engaged in maritime employment nor injured at a maritime situs since the facility was not presently being used for shipbuilding. *Id.* at 542–43.

The most extended discussion of "adjoining area" came in *Perdue*. Perdue injured his knee when he fell while leaving the bus supplied by his employer to take employees to the office for checking out on the time clock. The court stated:

> In our view, the Board should have sustained the Administrative Law Judge's determination that Perdue was not injured on a situs defined by new Section 903(a). There is literally nothing in the record to support a conclusion that the employer's office was on the navigable waters or in an "adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." The vessel upon which Perdue was working was a mile away, and the "punch out" office was a purely clerical and administrative post separated from the waters by other facilities which likewise were not used for loading, unloading, ship repair, or shipbuilding. [The parties have stipulated that the nearest body of water was 500 yards away from the office.] Under no reasonable construction of the Act did this area either "adjoin" the waters or carry out any of the functions specified in Section 903(a). We reject the argument that the new Act covers every point in a large marine facility where a ship repairman might go at his employer's direction. In the words of the Administrative Law Judge below, the locus of this injury had "nothing to do with loading, unloading, building or repairing vessels" (Appendix at 19). Therefore we must reverse the Board's determination that Perdue is entitled to compensation under the new Act.

*Id.* at 541–42 (footnote added to text). The office was not an "adjoining area customarily used" for maritime purposes.

The second discussion of "adjoining area" came in *Alabama Dry Dock & Shipbuilding Co. v. Kininess*, 554 F.2d 176 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) (*Alabama Dry Dock*). The employee fractured his pelvis while sandblasting a disassembled crane. The Court stated:

> *Alabama Dry Dock* cites language in the statute which defines the situs as one "adjoining" navigable waters. The company argues that because the back lot in which the crane was stored did not abut the water, it is not a maritime situs. The record does not disclose the position of the lot, and the estimates in the briefs place it from 150 to 2,000 feet from the water's edge. In any event, the physical distance is not decisive here. The test is whether the situs is within a contiguous shipbuilding area which adjoins the water. Alabama Dry Dock's shipyard adjoins the water. The lot was part of the shipyard, and was not separated from the waters by facilities not used for shipbuilding. *See Perdue, supra*, 539 F.2d at 542. Furthermore, the lot itself was "customarily used" for the maintenance and repair work engaged in by Kininess. It was an area in which work directly

---

ture time. 533 F.2d at 541. In *Caputo*, however, the Supreme Court rejected the timing requirement for "maritime employment." 432 U.S. at 273–74, 97 S.Ct. at 2362. Although the panel's stated basis for implying a time require-ment for situses has been undermined, we do not suggest that there might not be other grounds for the requirement. The issue is not presented by this case.

related to shipbuilding was taking place. *Cf. Stewart v. Brown & Root, Inc.*, 5 B.R.B.S. 37 (ALJ) (Sept. 30, 1976) (worker in shipyard under construction not covered.)

*Id.* at 178. The court held that even though the back lot did not touch water, it was in a contiguous shipyard area which was "customarily used" for maritime purposes.

Petitioners argue that the panel's decision in this case ignores the holdings of *Jacksonville Shipyards* and *Alabama Dry Dock.* Petitioners interpret these cases as stating that the point at which the injury occurs must not be separated from the water by any building used for nonmaritime purposes. We disagree.

In *Jacksonville Shipyards*, the office was "purely clerical and administrative." 539 F.2d at 542. It therefore was not a building "customarily used by an employer in loading, unloading, repairing, or building a vessel." *Id.* The nonmaritime character of the office was also the basis of the ALJ's opinion. The court did note that the office was "separated from the waters by other facilities which likewise were not [so] used." *Id.* Although nonmaritime character of nearby building may be a factual indicator of "customary use," it is not a conclusive test for determining LHWA jurisdiction.[12]

In *Alabama Dry Dock*, the absence of nonmaritime facilities between the lot and the water was listed as a factor favoring coverage. 554 F.2d at 178, *citing Jacksonville Shipyards*, 539 F.2d at 542. Nevertheless, just as the presence of nonmaritime buildings is not a per se barrier to jurisdiction, the absence of nonmaritime facilities does not automatically signal coverage. The court looked at all the factors in determining that the back lot was a maritime situs in an adjoining shipbuilding area customarily used for building vessels.

We reject the position that the presence or absence of nonmaritime buildings between the point of injury and the water is an absolute test for whether an injury is covered under the LHWA. Such a rule would introduce into the tests for coverage a new fortuity that would frustrate the congressional objective of providing a uniform system expanding coverage to landward maritime sites. The character of surrounding properties is but one factor to be considered in determining whether a site is an "adjoining area" under the LHWA. *See Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137, 141 (9th Cir. 1978). Variations in the purposes for which the area is used will not necessarily preclude coverage.

We therefore do not agree that Fifth Circuit precedent required a holding that in the absence of an uninterrupted line of maritime facilities between the locus of the injury and the water, no LHWA jurisdiction is present.[13] Although some buildings near the gear room were of a nonmaritime character, this fact alone does not require reversal of the ALJ's decision.

## V. ADJOINING AREAS

The question remains, however, whether we are developing a maritime situs rule broader than that envisioned by Congress. Congress was motivated by a desire to cover maritime operations occurring on land and to provide continuous, uniform coverage for employees who otherwise would have been covered for only part of their activities.[14] The best way to effectuate the congressional purposes is to determine the situs question by looking at all the circumstances.

The situs requirement compels a factual determination that cannot be hedged by the labels placed on an area. *Jacksonville Shipyards*, 539 F.2d at 541. Just as we

---

**12.** On the point of injury approach, see § V *infra.*

**13.** We do, however, reject the point of injury approach taken in the *Perdue* case in *Jacksonville Shipyards. See* § V *infra.*

**14.** For the committee reports, see note 8 *supra.*

disapprove of a test that disposes of the question based totally on the presence or absence of intervening or surrounding maritime facilities, we also reject the idea that Congress intended to substitute for the shoreline another hard line. Growing ports are not hemmed in by fence lines; the Act's coverage should not be either. All circumstances must be examined. Nevertheless, outer limits of the maritime area will not be extended to extremes. We would not extend coverage in this case to downtown Houston. The site must have some nexus with the waterfront.

Petitioners assert that the gear room does not meet the statutory test because it does not abut the water. Under petitioners' interpretation of section 903(a), only the narrow strip of facilities physically touching the water can be maritime situses.

This circuit rejected this construction in *Alabama Dry Dock* in which the claimant was injured in a back lot. 554 F.2d at 178.[15] *See also Handcor Inc. v. Director, Office of Workers' Comp.*, 568 F.2d 143 (9th Cir. 1978) (adjoining terminal); *Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137 (9th Cir. 1978); *Dravo Corp. v. Banks*, 567 F.2d 593 (3d Cir. 1977); *Dravo Corp. v. Maxin*, 545 F.2d 374 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). The statute does require the injury to occur in an "adjoining area." The Senate Report's Summary of the amendments states that the bill extends coverage to "the contiguous dock area related to longshore and ship repair work." S.Rep.No.92–1125, Cong., 2d Sess. 2 (1972). *See also* 118 Cong.Rec. S37283 (1972) (remarks of Sen. Eagleton) (identical language). Other statements in the legislative history merely repeat that the statute extends coverage to "adjoining areas." *See* H.Rep. at 10–11;[16] 118 Cong.Rec. S36271 (1972) (remarks of Sen. Williams); *id.* at H36381–82 (remarks of Rep. Daniels).

■ Although "adjoin" can be defined as "contiguous to" or "to border upon," it also is defined as "to be close to" or "to be near."[17] "Adjoining" can mean "neighboring."[18] To instill in the term its broader meanings is in keeping with the spirit of the congressional purposes.[19] So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee's injury can come within the LHWA. To require absolute contiguity would be to reenact the hard lines that caused longshoremen to move continually in and out of coverage. It would frustrate the

---

15. In *Jacksonville Shipyards*, the pier–side warehouse in *Bryant* was probably right next to the water and therefore did not raise the question of whether it "adjoined" water. Although the fabrication shop or ship in *Nulty* was 300 feet from the ship under construction, the opinion does not indicate how far it was from the water.

16. The relevant portions of the House and Senate Reports are reprinted at note 8 *supra*.

17. *See, e. g.*, Shorter Oxford English Dictionary 24 (1978); Webster's Third New International Dictionary 27 (1976); Funk & Wagnalls New Standard Dictionary of the English Language (1949).

18. Webster's New World Dictionary of the American Language–College Edition 18 (1960).

19. *See generally* G. Gilmore & C. Black, Jr., The Law of Admiralty § 6–50 at 424 (2d ed. 1975)

"Adjoin" presumably means something like "border on" or "have direct access to" navigable waters; all the facilities mentioned, with the possible exception of "terminals," seem to meet that linguistic test. It is less clear whether the "adjoining area[s] customarily used ... in loading, unloading, repairing, or building a vessel" must themselves "adjoin" navigable waters or whether it is sufficient that they "adjoin" piers, wharves, dry docks and so on. It may be assumed that the intent of the Congressional draftsman was to cover all employment–related injuries suffered by workers engaged in the specified activities. If that assumption is correct, "adjoin" should be broadly, not narrowly, construed; the essential test should be whether the injury occurred in the course of maritime employment and not on how close the situs of the injury was to the water's edge. Even on the level of linguistic analysis, the inclusion of "terminal[s]" in the first of the two lists may be thought to favor the broader construction of "adjoin."
*Id.* (footnote omitted).

congressional objectives of providing uniform benefits and covering land–based maritime activity.

But even if we were to require strict contiguity, petitioners' construction would not prevail. The other key word in the statute's phrase is "area." Area is a broad term, and the overall area within which the gear room was located does "adjoin" navigable waters. The question is where to draw the lines around the "area" in a given case. Although all of Houston is an "area" that "adjoins" navigable waters, to sweep that widely would be absurd. Conversely, fencelines and employers' designations will not, as stated above, end the factual inquiry. Fencelines and local designations are subject to manipulation for compensation purposes. Such a refusal to exalt form over substance is consistent with the Supreme Court's analogous rejection of union membership as the hallmark of status, *Caputo*, 432 U.S. at 268 n.30, 97 S.Ct. at 2359; *Pfeiffer*, 444 U.S. at 80, 100 S.Ct. at 336; and the Court's rejection of the "point of rest" theory. *Caputo*, 432 U.S. at 274–79, 97 S.Ct. at 2362–2365.

■ The answer to the question of where the boundaries are to an "area" is found right in the statute. The perimeter of an area is defined by function. The "area" must be one "customarily used by an employer in loading, unloading, repairing, or building a vessel." The statute does not require that the area's exclusive use be for maritime purposes so long as it is customarily used for significant maritime activity. The statute does not restrict coverage to only these areas used by the claimant's employer. It is an "area" if it is customarily used by any statutory employer. *Odom Construction Co., Inc. v. United States Dep't of Labor*, 622 F.2d 110, 113 (5th Cir. 1980).

■ In LHWA cases, this determination of whether a site is an "adjoining area" is handled by the ALJ and reviewed by the Board. The Act should be liberally con-

strued in favor of injured workers, "in conformance with its purpose, and in a way that avoids harsh and incongruous results." *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953); *see Caputo*, 432 U.S. at 268, 97 S.Ct. at 2359; *Jacksonville Shipyards*, 539 F.2d at 541. The ALJ is guided in his factual determination by the section stating that in the absence of substantial evidence to the contrary, LHWA coverage is presumed. 33 U.S.C. § 920(a) (1976). *See Jacksonville Shipyards*, 539 F.2d at 541. *Cf. Pittston Stevedore Corp. v. Dellaventura*, 544 F.2d 35, 48 (2d Cir. 1976), *aff'd sub nom. Northeast Marine Terminal Corp. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *Stockman v. John T. Clark & Son*, 539 F.2d 264, 269–70 (1st Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977) (presumption of coverage applies to factual, not legal, questions). If the situs determination is supported by substantial evidence on the record as a whole, it will not be set aside by this court. *Jacksonville Shipyards*, 539 F.2d at 541, *citing O'Leary v. Brown–Pacific–Maxon, Inc.*, 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951) *and Cardillo v. Liberty Mutual Insurance Co.*, 330 U.S. 469, 478–79, 67 S.Ct. 802, 806–807, 91 L.Ed. 1028 (1947).

■ In this case, the Avenue N gear room was not clearly outside the waterfront area customarily used by employers for gear rooms. *See* Appendix I. The ALJ found that the gear room operations were part of the on–going overall loading process. App. 15–16. He found that the gear room was "in the most desirable position for servicing the docks in the Port of Houston," and that the gear rooms of most stevedores were not on the docks proper. *Id.* at 11. The gear room was as close to the docks as was feasible. Substantial evidence exists to support a finding that the Avenue N gear room was in an area customarily used by employers for loading. Not only does that area adjoin the navigable waterway, but the gear room itself has a sufficient nexus to the waterfront.

We note in conclusion that in the *Jacksonville Shipyards* decisions the panel examined the precise place where the injury occurred rather than the broader area. Because the office building in the *Perdue* case was not "customarily used" for maritime purposes, the panel held the injury did not occur at a section 903(a) situs. From the facts supplied in *Perdue*, one cannot tell the nature of the overall area where the office was located. One might assume that the presence of intervening nonmaritime buildings would be an indication that the office was not in an overall area "customarily used" for maritime purposes. Exhibits petitioners supplied to the en banc court, however, indicate that the general area may have been so used.[20] Although in the case we now consider both the gear room and the overall area were "customarily used" for loading, *Perdue* calls to question the appropriateness of a broad interpretation of the term "area." What if the specific locus of the injury is not customarily used for maritime purposes even though the general area is so used? The requirement that the employee be engaged in "maritime employment" would not necessarily prevent coverage of injuries in such areas since the Supreme Court has stated that the employee need not be engaged in maritime employment at the time of the injury so long as part of his employment is maritime. *Pfeiffer*, 444 U.S. at 83 n. 18, 100 S.Ct. at 337 n.

18, *Caputo*, 432 U.S. at 272–74, 97 S.Ct. at 2361–2362. The Supreme Court's rationale was that to do otherwise "would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate." *Caputo*, 432 U.S. at 274, 97 S.Ct. at 2361–2362. The same rationale supports a broad interpretation of "area" since it will reduce the number of employees walking in and out of coverage. To the extent that *Perdue* indicates otherwise, it is overruled.

## VI. CONCLUSION

Our construction of section 903(a) is consistent with the congressional purposes behind the 1972 amendments. A broad interpretation of the maritime situs requirement reduces the number of workers walking in and out of coverage and promotes uniformity.[21] It also is in line with the congressional desire to extend coverage to those maritime chores that technology has moved ashore. In addition, this interpretation is in keeping with the Supreme Court's expansive approach to interpreting the amendments' "employee" status test in *Caputo* and *Pfeiffer*. Furthermore, a broad view of the situs test has been adopted in other circuits. *E. g., Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137 (9th Cir. 1978); *Dravo Corp. v. Maxin*, 545 F.2d 374 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). The finding of LHWA coverage is AFFIRMED.

---

**20.** Aerial photographs, surveys, charts, demographic studies and exhibits such as Appendix I are extremely helpful in determining whether or not a particular site is within an "adjoining area." One picture may be clearer than a thousand words.

**21.** This "uniformity" does not mean that Congress has preempted state compensation remedies with the 1972 amendments. The Supreme Court has held that the LHWA is a concurrent, not an exclusive, remedy. *Sun Ship, Inc. v. Pennsylvania*, —— U.S. ——, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980). The Court indicated that the "jurisdictional compass" of the LHWA will be somewhat vague, *id.* at ——, 100 S.Ct. at 2438, a further indicator that a case-by-case approach to situs is not out of step with the spirit of the amendments.

APPENDIX I

Texports' Gear Room

● Stevedores' Gear Rooms

TJOFLAT, Circuit Judge, with whom COLEMAN, Chief Judge, AINSWORTH, RONEY, GEE, JAMES C. HILL, GARZA and RANDALL, Circuit Judges, join, dissenting:

I respectfully dissent from the opinion the majority offers in this case.

This case is concerned solely with interpretation of the situs requirement of the two–part test [1] for coverage under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1976). The relevant portion of that statute is section 903(a), which in pertinent part reads:

> Compensation shall be payable under this chapter in respect of disability or death of an employee but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . .

33 U.S.C. § 903(a) (1976).

In particular, we have been asked to delineate specifically the scope of the phrase "other adjoining area" found in the parenthetical expanding the statutory definition of "navigable waters of the United States." The majority has responded to this request with an extremely imprecise situs rule:

> The best way to effectuate the congressional purposes is to determine the situs question by looking at all the circumstances.

> The situs requirement compels a factual determination that cannot be hedged by the labels placed on an area. . . . All circumstances must be examined. Nevertheless, outer limits of the maritime area will not be extended to extremes. We would not extend coverage in this case to

downtown Houston. The site must have some nexus with the waterfront. . . . So long as the site is close to or in the vicinity of navigable waters, *or in a neighboring area*, an employee's injury can come within the LHWA.

*Texports Stevedore Co. v. Winchester*, at 513–515 (emphasis added). The majority continues:

> The question is where to draw the lines around the "area" in a given case. Although all of Houston is an "area" that "adjoins" navigable waters, to sweep that widely would be absurd. . . . *The perimeter of an area is defined by function.* The "area" must be one "customarily used by an employer in loading, unloading, repairing, or building a vessel." The statute does not require that the area's exclusive use be for maritime purposes so long as it is customarily used for significant maritime activity.

*Id.*, at 515 (emphasis added).

Adoption of this broad and nebulous interpretation of the situs requirement is, in my judgment, inappropriate. By failing to indicate clearly the parameters of recovery, the court is unfaithful to both the overall purpose of the Act and to the statutory language Congress employed to implement that purpose.

The Longshoremen's and Harbor Worker's Compensation Act, as its name indicates, is a workers compensation scheme. As such, it is geared toward a nonlitigious, speedy, sure resolution of the compensation claims of injured workers. *See, Guadet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). The majority admits, however, that its interpretation of the Act's situs requirement will lead to a case–by–case determination of claims. *See Texports Stevedores Co. v. Winchester*, at 516 n. 21. This result inevitably will hinder administration of the Act; it will en-

---

1. The two parts of this coverage test have been denominated the status and situs requirements. *See: P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 72, 100 S.Ct. 328, 332, 62 L.Ed.2d 225 (1979); *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 264–65, 97 S.Ct. 2348, 2357, 53

L.Ed.2d 320 (1977). *See also* the majority opinion in this case, *Texports Stevedore Co. v. Winchester*, at 510. The status test is enunciated in 33 U.S.C. § 902(3) (1976); its interpretation is not involved in this appeal.

gender uncertainty on the part of all parties and arguably drain funds, through the increased costs of overbroad coverage and the ensuing litigation, otherwise available for compensation of those clearly contemplated by the Act: "It is obvious that extending the Act's coverage too widely must, of necessity, reduce the amount of funds available to improve the safety conditions for those most clearly coming within the Act–the pierside and shipboard longshoremen." *Sea–Land Service, Inc. v. Director*, 552 F.2d 985, 997 n. 23 (3d Cir. 1977). Surely the Act must be construed liberally to further its remedial, humanitarian purposes, *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977), but its construction must be practical enough to facilitate rather than impede achievement of the avowed purpose of the legislation. The majority's interpretation of the situs requirement solves only Winchester's case; as respondent candidly admits, the adjoining area specified in 903(a) may well end one city block farther from the water than where Winchester was injured. Supplementary Brief for Respondent at 27. The majority does not clearly resolve that issue here. This court very probably will, however, be called upon in the future to decide that very issue; until then, those injured parties still in the dark about the extent of their federal compensation remedy will suffer added expense and unnecessary delay.

The majority, in my view, also misinterprets the language of section 903(a). Adjoining area, as used in the statute, refers to a particular site; it does not refer to a neighborhood in the vicinity of navigable water. The statute refers to "any adjoining pier, wharf, dry dock, terminal ... or other adjoining area...." The second mention of area, understood on the basis of common linguistic usage, refers to another sort or type of maritime situs, akin to a pier or wharf, for example, that adjoins naviga-

ble water.[2] It is to be understood as referring to a particular place, an individual site, not a broad region. *See Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137, 141 (9th Cir. 1978) (reaching a result contrary to that which this dissent would support, yet nevertheless reaching that result by reference to "adjoining area" in terms of a particular site rather than in terms of general neighborhood). Thus, our inquiry here should be whether the *gear–room* where Winchester was injured adjoins the water for purposes of section 903(a), not whether the gear–room is located in a neighborhood adjoining navigable water. Given this reading of adjoining area, even respondent admits that the Act would not provide for Winchester's recovery; at oral argument Respondent stated: "The gear–room itself, here, ... does not, if we only look at the gear–room, it does not adjoin the water and hence it does not satisfy the situs test.... If the gear–room is the area, it doesn't adjoin." Tape of Oral Argument.

Furthermore, the majority errs by defining section 903(a)'s limitation on recovery in terms of the functional character of an area. Section 903(a) is to be read as a *geographical* limitation on the extent of recovery allowed under LHWCA: "§ 3(a) ... limits the geographic coverage of the Act ..." *P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 78, 100 S.Ct. 328, 335, 62 L.Ed.2d 225 (1979). The Act provides compensation for injury occurring in an adjoining area; that the area is used in "loading, unloading, repairing or building a vessel" is a requirement for recovery *given* the condition precedent of the injury's occurrence within an otherwise covered area. Area is not defined by function, rather maritime function modifies or narrows coverage within the geographic area contemplated by the Act: "We reject the argument that the new Act [the 1972 LHWCA amendments] covers every point in a large marine facility where a ship repairman might go at his

---

**2.** Whether an "other adjoining area" need border an actually navigable body of water or merely border a pier or dry dock is something of a tautological inquiry: navigable water, by statutory definition, includes a pier or a dry dock, and thus adjoining such a site would be sufficient under the Act.

employer's direction." *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533, 542 (5th Cir. 1976) (referring to a "purely clerical and administrative" office located within a maritime terminal area). To approach the situs question as one determined solely by function is effectively to read the situs requirement out of the Act, an inappropriate result.

It is clear that Congress intended to limit geographically the extent of coverage provided by LHWCA. As respondent states: "[T]he Act's coverage cannot follow [covered] employees regardless of where they go in the course of their employment, because the 'navigable waters' test was expanded rather than eliminated." Supplementary Brief for Respondent at 8–9. If Congress had wished to provide coverage for all injuries resulting from employment functionally related to maritime activity, regardless of locale, it could have eliminated the situs requirement from the statute. *See Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 223–24, 90 S.Ct. 347, 354, 24 L.Ed.2d 371 (1969). *See also Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 52, 55 S.Ct. 31, 41, 79 L.Ed. 176 (1934); *Jacksonville Shipyards v. Perdue*, 539 F.2d 533, 545 (5th Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

Since a geographical limitation on LHWCA coverage is mandated, I would draw the line illustrating that limitation with clarity to isolate sure, and statutorily defendable parameters of recovery. Implementation of the *Alabama Dry Dock & Shipbuilding Co. v. Kininess*, 554 F.2d 176, 178 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) contiguity test would achieve that goal: "The test is whether the situs is within a contiguous shipbuilding area which adjoins the water." This test also comports with the intent of Congress: "The bill also expands the coverage of this Act to cover injuries occurring in the *contiguous* dock area related to longshore and ship repair work." S.Rep.No.92–1125, 92d Cong., 2d Sess., 2 (1972) (emphasis added).

The argument may be made that the *Alabama Dry Dock* test will exclude from coverage a significant number of maritime workers. There are no statistics in the record to indicate the extent of exclusion if the contiguity test is employed. In any event, given section 903(a)'s geographic limitation on recovery, it is inevitable that some maritime workers, engaged in admittedly maritime related activity, will be excluded from LHWCA coverage. It is within the purview of Congress to assess the impact of this exclusion. Our task is to articulate the test that realistically illustrates the scope of LHWCA coverage given the Act's purpose and the statutory language. We should not shy away from that task because of a judicial recognition that perhaps Congress has effectively excluded more workers from coverage than proper given the realities of modern maritime work. We should avoid overly broad, legislative holdings. "The invitation to move that line [of coverage]," to quote Justice White, "must be addressed to Congress, not to this Court." *Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 223–24, 90 S.Ct. 347, 354, 24 L.Ed.2d 371 (1969).

For these reasons, I dissent.

