HIGGINSON, Circuit Judge,
concurring in the judgment:
Farsightedly or fortuitously, Congress in 1972 amended the Longshore and Harbor Workers’ Compensation Act (Long-shore Act), 33 U.S.C. §§ 901-50, legislation that this Court applied in Texports Stevedore Co. v. Winchester, 632 F.2d 504 (5th Cir.1980) (en banc), setting forth a two-part rule that extended benefits coverage to injuries not just on navigable waters, but also at specific “adjoining” facilities (“pier, wharf, dry dock, terminal, building way, marine railway”), as well as any “other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.” 33 U.S.C. § 903(a). Congress sought to be comprehensive of common shipping facilities, such as piers, docks, and wharfs, as well as other “adjoining” property provided that the property is “used by an employer in loading, unloading, repairing, dismantling, or building a vessel.” Id. Not to restrict coverage to nomenclature, Congress in § 903(a) extended coverage to “other adjoining areas,” but again, only if such areas are used for vessel-related activities.
In my view, this necessity of proximity to a navigable waterway as well as with the functional requirement that the area is “customarily used for loading, unloading, repairing ... a vessel ” (emphasis added), requires reversal in the case before us because the Chef Yard area was not used to load or unload or repair vessels. Its use, like many current and under-construction container terminals (some even named “inland ports”) was container repair, storage, and transshipment by ground, air, or sea. These container yards do exist to support port, air, and rail gateways, but they have emerged since Congress’ amendments to the Longshore Act and we cannot declare that just because of their recent essentiality, they have become areas that load, unload or repair vessels.
This short plain language analysis necessitates reversal in this case because the Benefits Review Board, utilizing dicta from our decision in Coastal Production Services, Inc. v. Hudson, 555 F.3d 426 (5th Cir.2009), that Longshore Act coverage could extend beyond vessel work to more general work “associated with items used as part of the loading process,” id. at 434, goes beyond Congress’ legislation and its purpose, indeed, beyond the reality of cargo shipping prevalent fifty years ago. It may be that Congress will determine that containers have become the functional equivalent of vessel-loading equipment, like cranes, or are becoming even the functional equivalent of the holds of vessels themselves. But I do not think that we enlarge the commonsense meaning of the word “vessel” ourselves.
Consequently, I would reverse the Benefits Review Board decision and clarify that the clause “associated with items used as part of the loading process” in Hudson cannot be understood to expand Long-shore Act coverage beyond areas that operate to load and repair vessels to areas that operate to store and repair the cargo containers that go onto vessels and trains and trucks.
*399 Deciding this case on the word “vessel,” I would not reach whether we would answer differently what the word “adjoin” meant to Congress half a century ago. Contemporaneous with that syntactical choice, our court, then also sitting en banc, gave its reasoned answer, not withholding Longshore Act coverage when the area of injury was a dock equipment room that, unlike two other gear rooms, was not “on the docks” abutting the water because “the docks had insufficient space for an additional gear room,” so it had to be located five blocks away. Winchester, 632 F.2d at 507.
I would not disturb our decision in Winchester because it is time-settled, cf. Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); because it was authored by a majority of judges who were contemporaries with the statute they were interpreting; because that decision, defining “adjoin” as adjacent, is as faithful to Congress’ literal instruction as the majority’s decision today assigning a strict contiguity meaning; and because the rule propounded by Congress, applied by us in Winchester, announced a layered approach which has proven fair and workable over fifty years of change that always will be the circumstance of longshoreman work.
Even etymologically, I do not think we are in a position to say there is certainty that “adjoin” means contiguousness, not adjacency. Shakespeare spoke of the hills “adjoining” Alexandria. From the standpoint of persons, industry, and legislators, unbroken contiguity to navigable water is impractical for reasons that our court identified in Winchester and that are even more pressing today: land abutting water is finite and expensive, yet ship size and cargo capacity, total shipping volume, and loading and offloading equipment are ever-increasing. See Winchester, 632 F.2d at 513-14.
Neither the record in this case, nor in any case drawn to our attention, suggests that Congress’ layered approach, applied in Winchester, has proven unworkable.[1] Indeed, if impracticality or uncertainty or injustice has occurred, Congress would receive and test that proposition in hearings and tighten the interpretation of § 903(a) that we have applied for almost half a century. But no reference to a proposal for legislative action has been drawn to our attention. By contrast, this court in Winchester, at the time presiding over port, shipping and longshoreman activity from Florida to Texas, pointed out that a strict abutment rule could exacerbate the very gangplank benefits coverage problem Congress sought to alleviate. 632 F.2d at 514-15. Employers could relocate obvious longshoreman’s work across a property break. This in fact was the circumstance in Winchester, compelled not by a desire to withhold benefits but simply because there was no more dock space. Id. at 507.[2]
For the above reasons, I concur in the judgment of the court.

. During oral argument, the Hudson case was identified as proof of unpredictability. But in Hudson, there was no contiguity problem because the platform where the injury occurred was located entirely at sea. See 555 F.3d at 428.

. Unsurprisingly, during oral argument to us, the answer candidly was given that rescinding Winchester would mean coverage would cease. There is no reason to criticize or call into question that answer. A property break could mean substantial cost savings which would be sensible, though the rule behind it would not be.