[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-14656

_____

USDL Docket No. 00-953A
Benefits Review Board No. 00-0953A

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 3, 2002
THOMAS K. KAHN
CLERK

LAURA PATRICIA BIANCO,

Petitioner,

versus

GEORGIA PACIFIC CORP.,

Respondent/Employer

and

UNITED STATES DEPARTMENT OF LABOR,
OFFICE OF WORKERS' COMPENSATION PROGRAMS,

Respondents.

_____

Petition for Review of an Order of the Benefits Review Board
United States Department of Labor

_____

**(September 3, 2002)**

Before HULL, FAY and GIBSON[*], Circuit Judges.

PER CURIAM:

_____

[*]Honorable John R. Gibson, U.S.Circuit Judge for the Eighth Circuit, sitting by designation.

Laura Patricia Bianco petitions for review of a final decision and order of the United States Department of Labor Benefits Review Board affirming an administrative law judge's denial of her claims for compensation under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq. Compensation under the LHWCA is available only if, among other things, a "situs" test is satisfied. Under that "situs" test, a work-related injury must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a). Relying on the "other adjoining area" clause, Bianco argues that she satisfied the "situs" test. After review and oral argument, we affirm the denial of Bianco's claim.

## I. FACTS

The relevant facts are not in dispute. Bianco's former employer, Georgia Pacific Corporation ("GPC"), operates a gypsum products plant in Brunswick, Georgia, on the banks of the Turtle and East Rivers. At its plant, GPC processes raw gypsum into two products: (1) sheet-rock; and (2) gypcrete, a raw material used by floor finishers.

GPC's system for receiving and then processing raw gypsum is as follows. Raw gypsum arrives by ship to the Lanier dock on the East River at the Port of

2

Brunswick. The ship is a "self-unloader" and has its own conveyer belt for unloading the gypsum into a hopper on the Lanier dock. Thus, that gypsum is first off-loaded into a hopper and then onto a second conveyer belt owned by Glynn County and the City of Brunswick. This second conveyer belt ships the gypsum to Transfer House No. 2. The individuals operating the hopper and the second conveyer belt do not work for GPC. The gypsum then comes out of the Transfer House No. 2 on a third conveyer belt and moves all the way to GPC's rock shed at its production plant. Employees of GPC operate this third conveyer belt.

At GPC's production plant, the raw gypsum is poured off of the conveyer belt and into the rock shed. GPC owns the rock shed, which it uses to store the raw gypsum until it is needed to manufacture sheet-rock or gypcrete. From the rock shed, the raw gypsum is crushed, screened, baked and then transported to either (1) the sheet-rock production department or (2) the gypcrete production department. The gypsum is then bagged to be sold as gypcrete or used in the manufacturing of sheet-rock. The finished product, whether gypcrete or sheet-rock, is transported from GPC's production plant by truck.

Bianco worked for GPC since 1977. During that employment, Bianco held several different jobs, some in the production plant and others in or around the

3

ships and/or conveyer belts unloading gypsum.[1]  Bianco suffered two work-related injuries, one on May 10, 1993, and one on July 28, 1995.  Both injuries occurred in the production departments of the GPC plant.

The May 1993 injury occurred while Bianco worked in the sheet-rock production department.  More specifically, at the time of her May 1993 injury, Bianco worked as a knife operator.  Knife operators work in the sheet-rock production department of the GPC plant and are responsible for cutting the sheet-rock into the appropriate length.  In this capacity, Bianco fell as she was hurrying to correct a malfunction of the knife machine.  That fall injured Bianco's right ankle and right knee.

The July 1995 injury occurred while Bianco worked in the gypcrete production department, operating the palletizer on the gypcrete production line. The palletizer is a machine that stacks filled bags of gypcrete at the end of the gypcrete production process.  Bianco injured her right arm while operating that palletizer.

## II. PROCEDURAL HISTORY

---

[1]Bianco testified that, through the years, she worked as a (1) laborer, (2) pre-decker, (3) cleaner in wet end, (4) paper hanger, (5) bundle operator, (6) riser, (7) supply operator, (8) crusher operator, (9) ship unloader, (10) utility person in the yard and gypcrete area, (11) truck unloader, and (12) painter/sandblaster.

Bianco filed two claims for compensation under the LHWCA, one for each of her work-related injuries. An administrative law judge ("the ALJ") held a hearing. The ALJ then entered a decision and order denying both of Bianco's claims for compensation.

The ALJ found that Bianco failed to satisfy the "situs" test under the LHWCA. In making his "situs" determination, the ALJ focused on whether Bianco's injuries occurred, as she argued, in an "adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." Although the ALJ concluded that the GPC conveyer belt and rock shed were "integral parts of the ship unloading process," the ALJ concluded that the specific, separate areas in which Bianco was injured – the sheet-rock and gypcrete production departments – were not "maritime locations" sufficient to satisfy the "situs" test. The ALJ rejected Bianco's claim that the designation of certain areas of the GPC facility as covered under the LHWCA necessarily meant that the entire GPC facility, including the production departments, must be considered a covered "situs."

Bianco's failure to satisfy the "situs" test alone precluded an award of compensation. Nonetheless, the ALJ also considered whether, for each of her injuries, Bianco satisfied the separate "status" test. The "status" test considers whether the claimant was "engaged in maritime employment." 33 U.S.C. § 902(3).

The ALJ concluded that Bianco satisfied the "status" test with regard to her May 1993 injury, but not with regard to her July 1995 injury.

Bianco appealed the ALJ's decision to the Benefits Review Board ("Board"), challenging the ALJ's finding that she did not satisfy the "situs" test for either injury. Bianco, however, did not challenge the ALJ's finding that she also did not have the requisite "status" with regard to her July 1995 injury. Because that "status" finding alone precluded recovery under the LHWCA (irrespective of whether the July 1995 injury occurred on a covered "situs"), the Board summarily affirmed the denial of compensation for that July 1995 injury. As for Bianco's May 1993 injury in the sheet-rock production department, the Board also affirmed the denial of compensation, concluding that the ALJ's "situs" determination was rational, supported by substantial evidence, and in accordance with the law.[2]

Bianco timely filed a petition for review of the Board's decision and order in this Court.[3]

_____

[2]Given this conclusion, the Board did not address GPC's cross-appeal. In that cross-appeal, GPC challenged the ALJ's finding that Bianco had the requisite "status" with regard to her May 1993 injury.

[3]The Director of the Office of Workers' Compensation Programs (the "Director"), technically a respondent in this appeal along with GPC, argues that the Board erred in affirming the ALJ's denial of Bianco's claims. Thus, the Director's and Bianco's interests on appeal are aligned. We refer to all arguments, whether raised by Bianco or the Director, as Bianco's arguments.

While we consider the Director's position in this appeal, we do not defer to that position. See Alabama Dry Dock and Shipbuilding Corp. v. Sowell, 933 F.2d 1561, 1562 (11th Cir. 1991) ("We owe deference to official expressions of policy

## III. STANDARD OF REVIEW

"We review the Board's decisions to determine whether the Board has adhered to its statutory standard of review and whether it has erred in interpreting the law." Alabama Dry Dock and Shipbuilding Corp. v. Sowell, 933 F.2d 1561, 1563 (11th Cir. 1991), abrogated on other grounds by Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, 506 U.S. 153 (1993). "This court, and the Board, must uphold the factual determinations of the ALJ if they are supported by substantial evidence in the record as a whole." Id. See Argonaut Ins. Co. v. Patterson, 846 F.2d 715, 718 (11th Cir. 1988) ("Our review of the Board's two opinions is limited . . . it is evident that we are to review only for errors of law, and to make certain that the Board adhered to its statutory standard of review of factual determinations.") (internal quotation marks omitted). Indeed, "[a]lthough this court reviews the ALJ's interpretation of the LHWCA de novo, it will not set aside the ALJ's findings of fact, including its situs determination, if substantial evidence supports them." Brooker v. Durocher Dock and Dredge, 133 F.3d 1390, 1392 (11th

---

by the Dir3ctor, who does administer the statute, but settled law precludes us from affording deference to an agency's litigating position."), abrogated on other grounds by Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, 506 U.S. 153 (1993); William Bros., Inc. v. Pate, 833 F.2d 261, 265 (11th Cir. 1987) ("Even assuming arguendo that the Director's interpretations as well as those of the Secretary are examples of agency construction which are entitled to deference, we do not agree that the Director's mere litigating position is due to be given deference.").

Cir. 1998) (citing Texports Stevedore Co. v. Winchester, 632 F.2d 504, 515 (5ᵗʰ Cir. 1980) (en banc)[4]). "If the situs determination is supported by substantial evidence on the record as a whole, it will not be set aside by this court." Winchester, 632 F.2d at 515.

### III. DISCUSSION

To receive compensation under the LHWCA, a claimant must satisfy four elements. Brooker, 133 F.3d at 1392. "First, the person must be injured in the course of employment." Id. (citing 33 U.S.C. § 902(2)). "Next, the employer must have employees engaging in maritime employment." Id. (citing 33 U.S.C. § 902(4)). "Third, the injured person must have 'status,' that is, be engaged in maritime employment." Id. (citing 33 U.S.C. § 902(3)). "Finally, the injury must occur 'upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).'" Id. (quoting 33 U.S.C. § 903(a)). "This last element is known as the 'situs' test." Id.

---

[4]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11ᵗʰ Cir. 1981) (en banc).

Here, only the "status" and "situs" tests were in dispute before the ALJ and the Board.[5] We first consider whether Bianco satisfied the "situs" test, as that determination may obviate the need to consider whether Bianco had the requisite status. Like the Board, however, we need not consider whether Bianco satisfied the "situs" test for her July 1995 injury in the gypcrete production department, as Bianco did not challenge the ALJ's finding that she did not have the requisite status for that injury.

Thus, the primary issue before this Court is whether the place of Bianco's May 1993 injury, the sheet-rock production department within the GPC facility, is a covered "situs" under the LHWCA. More specifically, we consider whether that sheet-rock production department is, as Bianco contends, an "other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel."[6] For the reasons discussed below, we find that it is not and affirm the denial of Bianco's claims.

Arguably, GPC's sheet-rock production department "adjoins" the navigable waters of the United States, even though the GPC facility is separated from navigable waters by certain city and county property. See Winchester, 632 F.2d at

---

[5]Bianco and GPC stipulated that Bianco was injured in the course of employment, and GPC has never argued that it does not have "employees engaging in maritime employment."

[6]Bianco has never argued that the area in which she was injured qualifies under the other sites listed in § 903(a). See 33 U.S.C. § 903(a).

514 ("'Adjoining' can mean 'neighboring.' To instill in the term its broader meanings is in keeping with the spirit of the congressional purposes. So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee's injury can come within the LHWCA.").[7] We need not resolve that issue, however, because even if GPC's sheet-rock production plant "adjoins" navigable waters, it is not an "area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel."

Indeed, "[t]he other key word in the statute's phrase is 'area.'" Winchester, 632 F.2d at 515. Although "[a]rea is a broad term," our precedent teaches us that "[t]he answer to the question of where the boundaries are to an 'area' is found right in [LHWCA]." Id. Specifically, "[t]he perimeter of an area is defined by function" and "[t]he 'area' must be one 'customarily used by an employer in loading, unloading, repairing, or building a vessel.'" Id. While the LHWCA "does not require that the area's exclusive use be for maritime purposes," the area must be "customarily used for significant maritime activity." Id. (emphasis added).

---

[7]Indeed, in Winchester, the former Fifth Circuit rejected an argument that the area in question must abut the water and concluded that an employer's gear room located five blocks from the gate of the nearest dock adjoined navigable waters. 632 F.2d at 514-15.

Unlike the former Fifth Circuit, the Fourth Circuit has strictly construed the term "adjoining," holding "that an area is 'adjoining' navigable waters only if it 'adjoins' navigable waters, that is, if it is 'contiguous with' or otherwise 'touches' such waters." Sidwell v. Express Container Servs., Inc., 71 F.3d 1134, 1138 (4th Cir. 1995).

Here, the sheet-rock production plant was not an "area" used either exclusively, or even customarily, for a maritime purpose or for significant maritime activity. There is no evidence that GPC ever used the sheet-rock production department for maritime activity, or that the production in that plant was part of the on-going overall process of unloading raw gypsum from the GPC vessels; instead, that "area" was used solely for manufacturing sheet-rock. Thus, the sheet-rock production area where Bianco was injured is not an "adjoining area." See Brooker, 133 F.3d at 1394 (concluding that substantial evidence supported an ALJ's finding that a seawall on which a claimant was injured was not an "adjoining area" because "[a]ny loading and unloading on the barges was accomplished without resort to the seawall. Therefore, while the seawall adjoined a navigable waterway, it was not a place of traditional maritime activity at the time of [claimant's] injury").

In apparent recognition that no maritime activity occurred in the specific area in which she was injured, Bianco points out that maritime activity occurred in other areas of the GPC facility, namely the areas where raw gypsum was unloaded from the GPC vessels. Bianco notes that the ALJ concluded that the conveyer belt

and rock shed areas of the GPC facility were covered under the LHWCA, given that those areas were "integral" to the "ship unloading process."[8]

Although she was not injured in either of those areas, Bianco argues, as she did before the Board, that the ALJ's finding in this regard was sufficient to bring GPC's entire facility, including the sheet-rock production area, within the situs requirement of § 903(a). Bianco contends that since a portion of the GPC facility is maritime, the entire facility must be, because to hold otherwise would result in workers walking in and out of coverage.

The evolution of the LHWCA indeed reflects a concern with workers walking in and out of coverage. Until 1972, the LHWCA applied only to injuries that occurred on navigable waters. Chesapeake and Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 46 (1989). This meant that "[l]ongshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they

---

[8]The ALJ reasoned as follows:
. . . I find the gypsum remains a "shipped" cargo until it arrives at the Georgia Pacific rock shed. Specifically, the unloading of the gypsum from the ship does not stop at the port authority's transfer house. Instead, the rock continues to be "unloaded" until it falls into the rock shed for storage. At that moment, the gypsum leaves the stream of maritime commerce and becomes "stored" cargo. Because the gypsum continues to be unloaded along the conveyer belt from the transfer house to the rock shed and into the rock shed, both the Georgia Pacific conveyer belt and the rock shed are integral parts of the ship unloading process. Consequently, that conveyer belt and the rock shed have maritime functions and each location is a maritime situs.

12

were performing the same functions whether on or off the ship."  Schwalb, 493

U.S. at 46.  As the Fourth Circuit put it,

> workers injured on navigable waters were covered under the
> LHWCA, while those injured on adjoining land, piers, or wharves
> were covered only by state workmen's compensation laws.  As a
> consequence, longshoremen continually walked in and out of
> LHWCA coverage as they walked up and down the gangplank from
> ship to shore during the loading and unloading of vessels.

Sidwell, 71 F.3d at 1135 (internal citation omitted).

The 1972 amendments to the LHWCA expanded the definition of "navigable

waters" to encompass "any adjoining pier, wharf, dry dock, terminal, building way,

marine railway, or other adjoining area customarily used by an employer in

loading, unloading, repairing, dismantling, or building a vessel."  33 U.S.C. §

903(a).  The 1972 amendments reflected "Congress' undoubted desire to treat

equally all workers engaged in loading or unloading a ship, whether they were

injured on the ship or on an adjoining pier or dock.  The former were covered prior

to 1972; the latter were not."  Herb's Welding Inc. v. Gray, 470 U.S. 414, 426

(1985).

As is evident from the above discussion, Congress was concerned with

workers walking in and out of coverage, but that concern was more with workers

engaged in maritime activity walking in and out of coverage at or near the water's

edge.[9] The facts in this case do not implicate that limited concern. Moreover, we agree with the Fourth Circuit's observation that "[w]hen Congress addressed a longshoreman's moving into and out of coverage at water's edge as he unloaded a ship or repaired it, Congress did not purport to eliminate the phenomenon of moving into and out of coverage--such a condition necessarily attends any geographical boundary of coverage." Brickhouse, 142 F.3d at 222.

In any event, while Congress' amendments clearly intended to limit the situations in which workers walk in and out of coverage, that does not give a court the license to reach out and expand coverage beyond the terms of the amendments in order to effectuate the policy which Congress sought to implement. Indeed,

---

[9]See Winchester, 632 F.2d at 510 n.8 ("'The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur upon the navigable waters of the United States. Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.'") (quoting House and Senate Committee Reports for the 1972 amendments) (internal quotation marks omitted); Jonathan Corp. v. Brickhouse, 142 F.3d 217, 220 (4th Cir. 1998) ("One of Congress' principal purposes in moving the coverage line landward was to provide more uniform coverage for longshoremen as they loaded and unloaded ships and repaired them. It made little sense that a longshoreman injured at one end of a gangplank was covered, while at the other end, he was not covered, even though he was doing the same job. Also, with the advent of containerization and other modern loading techniques, much of the loading and unloading work was done on the pier adjacent to the ship. Thus, Congress believed that coverage for a person who did traditional longshoremen's work both on the water and on the adjacent land should not depend on where the person was standing in relation to the water's edge when injured.") (internal citations omitted).

14

were we to conclude that GPC's entire facility (irrespective of what GPC does at different areas therein) is an "adjoining area" simply because certain areas of the GPC facility engage in maritime activity, we would effectively be writing out of the statute the requirement that the adjoining area "be customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel."[10] This we decline to do. See Winchester, 632 F.2d at 515 ("The perimeter of an area is defined by function. The 'area' must be one 'customarily used by an employer in loading, unloading, repairing, or building a vessel.'"); Brickhouse, 142 F.3d at

---

[10]Bianco contends (1) that "a broad interpretation of 'area' . . . reduce[s] the number of employees walking in and out of coverage, and (2) that this broad interpretation is "consistent with the congressional purposes behind the 1972 amendments." Winchester, 632 F.2d at 516. We are mindful of these teachings from our precedent. However, a broad interpretation of "area" is different from one that ignores other language in the statute indicating that a functional nexus to maritime activity must nonetheless exist. See Brickhouse, 142 F.3d at 221 (discussing the catchall "other adjoining area" clause of the LHWCA and stating, "Congress did not abandon its legislating principle of connecting this 'other area' to the work of longshoremen on navigable waters. The 'other area' annexed to navigable waters by the Act must again be 'adjoining' the water and must again be linked to the traditional longshoremen's work on the water. The 'other area' must be for the loading or unloading of cargo onto ships in navigable waters or for the 'repairing, dismantling, or building' of those ships").

We recognize that the necessary functional nexus to maritime activity to bring an area within coverage need not be great. Indeed, in Winchester, it was sufficient that the third "gear room" contained the equipment used to perform the loading operation. The problem for Bianco, however, is that the sheet-rock production area has nothing to do with, and no connection to, the loading or unloading of the raw gypsum. In contrast, the third "gear room" in Winchester that was five blocks away from the dock was an integral part of the loading operation.

15

222 (concluding that a claimant failed to satisfy the "situs" test and stating, "[w]hen [the claimant] worked on ships, which he occasionally did, he traveled by land to shipyards where he then installed fabricated parts. During these times, he was undoubtedly on a situs covered by the LHWCA. But while at the Tidewater Steel plant [fabricating steel parts], his situs was no different than it would have been at any steel fabrication plant anywhere in the land"); Jones v. Aluminum Co. of Am., 35 B.R.B.S. 37 (2001) (DOL Ben. Rev. Bd.) ("As employer's operation contains manufacturing facilities as well as areas used in maritime work, the entire site is not covered under [LHWCA]; the plant itself lacks the functional nexus to be considered a covered area, and it cannot be brought into coverage simply because goods are shipped by water from another portion of the facility.").

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the Board's decision and order.