DeMOSS, Circuit Judge,
dissenting:
Terry Hudson was injured while repairing a saltwater disposal pump on a fixed oil and gas production platform located in the state territorial waters of Louisiana. In my opinion, Hudson’s injury did not occur on a maritime situs. By treating the Cherokee loading barge and the production platform as a single LHWCA situs, the majority fails to apportion different functional areas within the same facility into covered and non-covered areas. I believe that the Cherokee has a functional nexus with maritime activities, but the production platform does not. The petition should be granted, and the decision of the BRB awarding LHWCA benefits should be reversed. Because the majority relies on an elastic definition of “loading” and allows the tail to wag the dog in its situs analysis, I respectfully dissent.
I.
In order to recover benefits under the LHWCA, the employee must satisfy both the situs and status test. Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 415-16, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). “Situs and status play equal, coordinate roles in determining coverage.” Thibodeaux v. Grasso Prod. Mgmt., Inc., 370 F.3d 486, 493 (5th Cir.2004). The situs test is derived from 33 U.S.C. § 903(a), which states, in relevant part:
[CJompensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of *442 the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or budding a vessel).
The majority correctly observes that the production platform where Hudson was injured does not meet the definition of any of the seven sites specifically listed in § 903(a), so it must qualify as an “adjoining area” to be considered a maritime situs. Therefore, Hudson can recover benefits under the LHWCA “only if [his] disability ... results from an injury occurring upon ... [an] adjoining area customarily used by an employer in loading ... a vessel.” Id. Hudson must demonstrate that he was located on a covered situs at the approximate time he sustained his injuries. See Thibodeaux, 370 F.3d at 488.
II.
The “adjoining area” must have both a geographical and functional nexus with maritime activities to qualify as a covered situs. See Texports Stevedore Co. v. Winchester, 632 F.2d 504, 514 (5th Cir.1980) (en banc). Because the production platform and the Cherokee are in direct contact with navigable waters, I agree with the majority that the geographical nexus prong of the situs test is satisfied. See id.; see also Thibodeaux, 370 F.3d at 494. My dissent argues that the production platform where Hudson was injured does not satisfy the functional nexus prong of the situs test.
The functional nexus inquiry is fact-intensive. See Winchester, 632 F.2d at 513, 515. The scope of the covered situs cannot be determined solely through reference to fence lines and employers’ designations, which are subject to manipulation. Id. at 515. Rather, “[t]he perimeter of an area is defined by function.” Id. An adjoining area must be “customarily used for significant maritime activity.” Id.
In my opinion, the BRB’s conclusion that Hudson was injured on a maritime situs is not supported by substantial evidence.[1] The production platform is not customarily used for any maritime activity, let alone significant maritime activity. In affirming the decision of the BRB, the majority disregards binding Fifth Circuit precedent holding that a “fixed oil and gas production platform,” which is connected to satellite wells and located in state territorial waters, does not qualify as a maritime situs under the LHWCA. See Thibodeaux, 370 F.3d at 487-88.
The majority purports to distinguish Thibodeaux from this case by relying on a single sentence within that eight-page opinion: “Oil is not shipped from the platform.” Id. at 494. Even assuming that this observation is the lynchpin of the Thi-bodeaux court’s situs analysis, it is undisputed that oil was not shipped from the production platform where Hudson was actually injured. Rather, oil was shipped from the Cherokee, which is geographical *443 ly separate and functionally distinct from the production platform.[2] Thibodeaux controls this case because Hudson’s injury occurred on the production platform, not the loading barge.
Under my analysis, “transportation” occurs at a maritime situs; “production” does not.[3] I define “production” to include both extraction (at the satellite wells) and separation (at the production platform); I define “transportation” to include the loading of cargo in maritime commerce (at the Cherokee). The production platform serves the non-maritime purpose of oil and gas extraction and separation, while the Cherokee serves the maritime purpose of a storage and loading facility for marketable crude oil. In addition to extraction and separation, the production platform also pipes marketable natural gas to shore, which even the majority acknowledges is a non-maritime activity. Because the perimeter of an adjoining area is determined by its function, the production platform should have been distinguished from the Cherokee in the majority’s situs analysis.
III.
The fourteen satellite wells feed an unmarketable mixture of oil, gas, and salt water, which is extracted from the subterranean strata beneath Barataría Bay, to the production platform. The production platform separates that mixture into two marketable products — crude oil and natural gas — and one waste product — salt water. At his deposition, Hudson testified that the production platform contains saltwater pumps, heater treaters, compressors, and dehydrators. Like many manufacturing plants, the production platform converts raw materials into marketable products.
The total flow from the satellite wells is gathered by a manifold on the production platform. Crude oil and salt water from the separation process flows to the heater treaters on the production platform, where marketable crude oil is temporarily stored. Gas from the separation process is metered for sale into the Southern Natural Gas pipeline, and reinjected throughout the field for gas-lift purposes. The salt water is stored in tanks on the production platform, and saltwater disposal pumps re-inject the salt water into the ground via a satellite well. The separation process that occurs on the production platform is a discrete stage of oil and gas production; it has nothing to do with the loading or unloading of a vessel.
From the 4,000 barrel-capacity storage tanks on the production platform, marketable crude oil is gravity fed via hard piping and flexible hose to the Cherokee loading barge, which has a 8,900 barrel-capacity. The production platform and the Cherokee are approximately thirty to forty feet apart and separated by open water. Marketable crude oil is pumped from the loading barge to transport barges via a pump located on the loading barge. The loading barge serves as a docking and loading facility, which can accommodate one 10,500 *444 barrel-capacity transport barge. During the eight months of Hudson’s employment,, a transport barge would come once or twice a week.
Hudson was injured while attempting to repair a saltwater disposal pump on the production platform. The reinjection of salt water, which is one of the final stages of the production process, prevents contamination of the oil storage tanks on the production platform. When Hudson cranked the pump, the starter exploded and caught on fire, resulting in serious burns and shrapnel wounds on his body. At the time of his injury, no transport barge was being loaded with crude oil from the Cherokee.
Hudson admitted that the vast majority of his activities as a contract operator were related to the servicing and maintenance of equipment on the production platform. No cargo or other materials are ever loaded or unloaded onto a vessel in the area of the platform where Hudson was injured. No pipeline connects the saltwater disposal pump to the Cherokee. The equipment used to produce oil and gas on the production platform is the same equipment used to produce oil and gas on the land. All of the loading equipment is located on the Cherokee;- Hudson did not venture onto the production platform during the loading process.
IV.
The crux of my argument is simple: the production platform, which extracts hydrocarbons and converts them into a marketable form, is functionally distinct from the loading barge, which facilitates the loading of marketable crude oil onto mobile transport barges. The production of a commodity at a non-maritime situs is different from the transportation of that commodity at a maritime situs. Although both the production platform and the Cherokee have oil storage tanks, only the Cherokee stores crude oil in a manner that facilitates the loading of a vessel.
The majority fails to grasp the following fact: oil and gas production is the only activity that occurred on the platform where Hudson was injured. In an effort to avoid the import of this inconvenient truth, the majority makes two flawed arguments: (1) the production platform is a covered situs because it is connected to the Cherokee by pipes and a permanent walkway, and (2) the production platform is a covered situs because it stores marketable crude oil in temporary storage tanks, which is part of the loading process. The first argument fails because it impermissi-bly bootstraps the loading activities that occur on a separate structure, and the second arguments fails because it relies on an over-inclusive definition of “loading.”
In holding that the production platform and the Cherokee constitute a single LHWCA situs, the majority allows proximity to trump functionality. The central issue is whether Hudson was injured on an “adjoining area customarily used by an employer in loading ... a vessel.” 33 U.S.C. § 903(a). When defining the scope of the LHWCA situs, “[t]he perimeter of an area is defined by function.” Winchester, 632 F.2d at 515. Under the functional approach, the production platform is inextricably intertwined with the satellite wells, not the Cherokee loading barge. Without one, the other is useless. The satellite wells and the production platform are involved in two distinct stages of the production process: the satellite wells extract an unmarketable mixture of oil, gas, and salt water from the subterranean strata, and the production platform separates that mixture into marketable products and disposes of the waste. The activities occurring on the production platform have nothing to do with cargo transportation or *445 maritime commerce. That happens later, at the loading barge.[4] Nevertheless, the majority’s analysis combines two structures that lack a functional nexus (the production platform and the loading barge) and separates two structures that share a functional nexus (the production platform and the satellite wells).
Production does not cease until you have a marketable product. In this case, you do not have a marketable product until the total flow from the satellite wells is separated using the saltwater pumps, heater treaters, compressors, and dehydrators on the production platform. Transportation begins when the crude oil is transferred from the temporary storage tanks on the production platform to the loading barge, at which point it becomes cargo awaiting transportation in maritime commerce.
The ALJ, the BRB, and the majority all focus on the fact that the production platform and the loading barge are connected via pipes and a permanent walkway. This observation does not alter the reality that production occurred on one functionally integrated structure (the satellite wells and the production platform) and transportation occurred on another (the Cherokee). Many land-based oil and gas production sites are connected, whether by pipeline or asphalt, to various maritime sites used for shipment of cargo by vessel. To further add to the confusion, the majority insists that the satellite wells and the production platform are not functionally integrated despite the fact that the satellite wells are connected to the production platform via gulf-floor transmission lines. If the determinative factor of the situs test is interconnectedness, why is the production platform inextricably intertwined with the loading barge but not with the satellite wells?
The majority refers to the close proximity and permanent attachment of the production platform and the Cherokee to support its argument that these two functionally distinct areas constituted a single, inseparable facility. We have previously held that function, not proximity or physical connectivity, is the determinative factor regarding situs. See Winchester, 632 F.2d at 515. While proximity and physical connectivity might provide some evidence of common function, they are not a substitute for it.
According to the majority, Hudson spent 90.2% of his time performing non-maritime activities on the production platform and 9.8% of his time performing maritime activities on the loading barge. In holding that the loading activities occurring on the Cherokee control the situs designation of the production platform, the majority is allowing the tail to wag the dog. The production platform where Hudson was injured is geographically separate and functionally distinct from the Cherokee. Perhaps there will be cases where the production and transportation areas in a single facility are situated over navigable waters and are not geographically separate and functionally distinct. This case does not fall within that hypothetical category.
The majority’s second argument relies on an expansive definition of “loading” that includes incidental storage at the site of production, regardless of whether that storage actually facilitates the loading of a vessel. After observing that marketable crude oil is stored in temporary storage tanks on the production platform, the majority argues that this storage is part of the loading process because “[i]f no oil flows from the platform’s storage tanks to the Cherokee, no oil is available for a *446 vessel to load.” Because part of the “general area” is used for loading, the majority concludes that the entire production platform is a covered situs. The majority’s reliance on the attenuated connection between post-production storage on the platform and loading on the Cherokee is suspiciously similar to the “but for” logic that it repudiates in a footnote.
Not all storage is related to loading. Most if not all production facilities contain temporary storage areas for finished products. In the absence of a pipeline, any land-based oil and gas production site must possess temporary storage tanks for marketable crude oil that has recently been extracted and separated. In my opinion, the statutory term “loading” does not encompass temporary storage at the production platform because that storage facilitates the production of crude oil, not the loading of a vessel. Only the Cherokee stores crude oil in a manner that facilitates the loading of a vessel. Unlike the crude oil stored on the production platform, the crude oil stored in the Cherokee is awaiting shipment by transport barge. The “hopscotch” hypothetical posed by the majority is a red herring because no part of the production platform, including the temporary storage tanks, is integral to the loading of the transport barges. The majority declares that the production platform was the “consolidation point for transport.” I beg to differ. The 8,900 barrel-capacity storage tank in the Cherokee serves that “gathering function,” not the temporary storage tanks on the production platform. The production platform gathers the total flow from the satellite wells in order to separate it, and the Cherokee gathers the crude oil from the production platform in order to transport it.
Over twenty years ago, the Supreme Court declared that oil and gas production is “not even suggestive of traditional maritime affairs.” Herb’s Welding, 470 U.S. at 422, 105 S.Ct. 1421 (citing Rodrigue v. Aetna Cas. & Sur. Co., 395 U.S. 352, 360-61, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)). The majority should have avoided expanding LHWCA coverage into this uncharted territory. See Herb’s Welding, 470 U.S. at 421, 105 S.Ct. 1421 (“[The plaintiffs] approach would extend coverage to virtually everyone on the stationary [drilling] platform. We think this construction of the [LHWCA] is untenable.”) (status case); Thibodeaux, 370 F.3d at 488 (“The sole issue for our review is whether a fixed oil production platform built on pilings over marsh and water and inaccessible from land constitutes either a ‘pier’ or an ‘other adjoining area’ within the meaning of § 903(a). We hold the platform in question is neither ....”) (situs case).
V.
Precedent from the Supreme Court, the BRB, the Fifth Circuit, and the Eleventh Circuit supports the conclusion that the production platform where Hudson was injured does not qualify as a covered situs. The cases cited by the majority are distinguishable.
The similarities between this case and Thibodeaux are striking. Both Hudson and Thibodeaux were injured while attempting to repair equipment on fixed oil and gas production platforms, which were connected to satellite wells. 370 F.3d at 487. The platform where Hudson was injured served no greater “maritime purpose” than the platform where Thibodeaux was injured. Id. at 490. These production platforms were not “customarily used by an employer in loading ... a vessel.” See 33 U.S.C. § 903(a). The only significant factual difference between the two cases is that the production platform in this case was attached by pipeline and a permanent *447 walkway to a separate structure used for loading marketable crude oil onto a transport barge.
In describing the Fifth Circuit’s “functional approach,” Thibodeaux reaffirmed the holding of Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533 (5th Cir.1976), that “a putative situs actually be used for loading, unloading, or one of the other functions specified in the Act.” Id. at 489 & n. 3. It is undisputed that Hudson’s injury did not occur on the Cherokee or a docked transport barge.
Thibodeaux also indicated that the “adjoining area” should have some resemblance to the other parenthetically enumerated structures in the statute. Id. at 491 n. 5. Although the loading barge, which has docking facilities, resembles a pier, we have previously held that an oil and gas production platform does not fall within that enumerated category because it does not have a connection to maritime commerce. See id. at 491, 493. Like any other land-based oil and gas production site, the platform in this case was solely used for a non-maritime function: the exploration and discovery of hydrocarbons, the drilling of test and production wells, the extraction of those hydrocarbons from subterranean strata, the separation of those hydrocarbons into marketable products, and the disposal of the production waste products.[5]
Both the Supreme Court and this Court have declared that the oil and gas production process has absolutely nothing to do with maritime commerce. See id. at 491 (“[I]t would be incongruous to extend [the LHWCA] to cover accidents on structures serving no maritime purpose.”); see also Herb’s Welding, 470 U.S. at 425, 105 S.Ct. 1421. Although Herb’s Welding is often pigeonholed as a “status” case, “[its] description of the work performed on fixed oil production platforms as non-maritime is highly relevant to the issue of whether the oil production platform has a connection to maritime commerce.” Thibodeaux, 370 F.3d at 494. Importantly, Herb’s Welding reaffirmed the classification of off-shore production platforms as “islands,” which reinforces the conclusion that the island where Hudson was injured was geographically separate and functionally distinct from the Cherokee, which was used to load cargo that was produced on that island. See 470 U.S. at 422 n. 6, 105 S.Ct. 1421 (citing Rodrigue, 395 U.S. at 360, 89 S.Ct. 1835).
VI.
I agree with Coastal’s argument that we must apportion different functional areas within the same facility into covered and non-covered areas. The apportionment principle naturally flows from the requirement that “[t]he perimeter of an area is defined by function.” Winchester, 632 F.2d at 515. Because this circuit has not been presented with a case requiring application of the apportionment principle, it is appropriate to look to persuasive precedent from the BRB and the Eleventh Circuit for guidance.
In my opinion, the BRB unsuccessfully distinguishes its own precedent indicating that the production platform is not a covered situs. In Jones v. Aluminum Co. of America, the decedent’s widow sued ALCOA under the LHWCA, claiming that her husband died of cancer due to exposure to asbestos on a covered situs. 35 BRBS 37, 2001 WL 467885, at *1 (April 9, 2001). The decedent worked as a millwright weld *448 er and later as a general mechanic, which required him to construct, repair, and maintain all types of equipment in the ALCOA facility, which was adjacent to the navigable waters of the Mobile River. Id. at *1, *6. The decedent’s regularly-assigned duties included repairing and maintaining the bauxite conveyor belt system, which was used to unload raw bauxite for the production of aluminum. Id. at *6. The conveyor belts “transported bauxite from the ships to [ALCOA’s] storage facility for later use in the manufacturing process.” Jones v. Aluminum Co. of Am., BRB No. 97-287, 31 BRBS 130 (Oct. 16, 1997). In addition to his work on the conveyor belt system, the decedent worked the vast majority of his time in the aluminum manufacturing plant, which was located near the docks and conveyor belts in the same ALCOA facility.
Regarding the situs issue, the BRB stated the following:
[Tjhat portion of employer’s facility where loading and unloading occur constitutes a maritime situs.
It is also clear, however, that employer’s manufacturing plant is not a covered situs. The Fifth Circuit’s decision in Winchester recognizes that the “function” of an adjoining area must be one that is used for the loading, unloading, repairing or building of vessels. A plant that manufactures aluminum oxide is not engaged in these functions. In Stroup [v. Bayou Steel Corp., BRB No. 97-1406, 32 BRBS 151 (BRB July 2, 1998)], the Board recognized that there is a point at which the maritime process ceases, and the manufacturing process begins, and vice versa. This statement is consistent with cases holding that employees, whose duties are integral to a manufacturing process rather than to a longshor-ing process, are not engaged in maritime employment pursuant to Section 2(3) of the Act. As employer’s operation contains manufacturing facilities as well as areas used in maritime work, the entire site is not covered under Section 3(a); the plant itself lacks the functional nexus to be considered a covered area, and it cannot be brought into coverage simply because goods are shipped by water from another portion of the facility.
Jones, 2001 WL 467885, at *6 (internal citations omitted).
In this case, the BRB held that the production platform where Hudson was injured was more analogous to the covered situs in Gavranovic v. Mobil Mining & Materials, 33 BRBS 1, 1999 WL 122921 (Feb. 23, 1999), than the non-covered situs in Jones. In Gavranovic, the employee’s injury occurred in a cargo storage building that was separate from the production area and was connected to another building that stored cargo awaiting transport by vessel. See Gavranovic, 1999 WL 122921, at *4. The BRB found that the building where the injury occurred was adjacent to navigable water, was in close proximity to the docks, and was not a separate and distinct area. Id. In both Gavranovic and Jones, the BRB recognized that the entire area used for loading and unloading, including the areas containing conveyor belts and cargo storage facilities, qualified as a covered situs. Jones, 2001 WL 467885, at *6; Gavranovic, 1999 WL 122921, at *4. Thus, if the employee is injured in an area used as part of the overall shipment process, then he is injured on a covered situs, but if the employee is injured in an area “where only manufacturing took place,” then he is not.[6] Jones, 2001 WL 467885, at *7.
*449 In my opinion, Jones is much more closely analogous to this case than Gavra-novic, upon which the BRB relied. Both Hudson and Jones performed work in the loading/unloading area and the manufacturing/production area of a facility that was adjacent to navigable waters. In Jones, the area where the bauxite was unloaded from vessels and moved by conveyor belt was geographically separate and functionally distinct from the area where the aluminum was manufactured. Similarly, in this case, the area where the oil was stored for future shipment and loaded onto vessels was geographically separate and functionally distinct from the area where the hydrocarbons were extracted and separated into marketable form.
In this case, like Jones, there was a point where the non-maritime production process ceased and the maritime loading process began. Both the production platform in this case and the aluminum manufacturing plant in Jones were part of larger facilities that were adjacent to navigable waters. After observing that an injury is covered under the LHWCA only if it occurs on a covered situs, the BRB remanded the Jones case to the ALJ for a determination of “whether decedent was exposed to asbestos on a covered situs,” i.e. while he worked on the conveyor belt system used to unload raw materials from vessels. Jones, 2001 WL 467885, at *8. In this case, we know that Hudson’s injury occurred while repairing a saltwater disposal pump on the production platform.
Similarly, in Melerine v. Harbor Construction Co., the BRB stated that “[t]he fact that the [steel] mill receives raw materials and ships its products by water, utilizing its dock area for loading and unloading, cannot in and of itself convert the site of the null into a covered situs.” 26 BRBS 97, 1992 WL 368658, at *4 (Sept. 25, 1992). The BRB noted that the steel mill and the loading dock were geographically separate and functionally distinct. See id. at *3. Because “the line between [the employer’s] manufacturing and loading operations is clearly drawn,” the BRB held that it was appropriate “to treat the mill as one functional area and the dock as another.” Id. at *4. Importantly, the BRB held that “finished products enter the stream of maritime commerce only after delivery by truck to the dock area.” Id.
Like Melerine, the line between production and loading operations is “clearly drawn” in this case. The marketable oil enters the stream of maritime commerce only after gravity-fed delivery of the cargo from the production platform to the loading barge. At that point, like the situation in Gavranovic, the crude oil is stored in the Cherokee in a manner that facilitates the loading of a vessel.
Finally, in Dickerson v. Mississippi Phosphates Corp., the BRB held that the employer’s phosphoric acid plant, which was located about 100 feet from a navigable waterway, was not a covered situs. 37 BRBS 58, 2003 WL 21041375, at *6 (April 29, 2003). The facts of Dickerson closely resemble the facts of Jones and Melerine. See id. at *5.
The BRB in Dickerson rejected the employee’s argument that the plant was a covered situs because it abutted navigable waters and was part of a larger manufacturing facility that included a dock area. Id. at *5. No loading or unloading of a vessel occurred in the area where the employee was injured, and the plant was not used for any intermediate steps in the loading process. Id. Because the plant did not have “a functional nexus to mari *450 time activity,” the employee could not satisfy the situs test. Id. at *6. The situs designation of the phosphoric acid plant was not altered by the presence of a pipeline that connected the phosphoric acid plant to the fertilizer plant, or the presence of a conveyor belt that connected the fertilizer plant to the dock. Id. at *5.
Dickerson demonstrates that the production platform’s situs designation is not affected by (1) the geographical proximity of the platform to either navigable waters or the loading barge; or (2) the pipes connecting the production platform to the Cherokee. Jones, Melerine, and Dickerson support the conclusion that we must apportion different functional areas within the same facility into covered and non-covered areas. I believe that the majority’s “all or nothing” approach fails to recognize this basic principle.
VII.
Eleventh Circuit precedent supports the conclusion that the production platform where Hudson was injured was not a covered situs. In Bianco v. Georgia Pacific Corp., the Eleventh Circuit addressed whether the sheetrock production department of a gypsum products facility qualified an “adjoining area” under § 903(a). 304 F.3d 1053, 1054 (11th Cir.2002).
In Bianco, the gypsum products facility lied on the banks of the Turtle and East Rivers. Id. Raw gypsum was unloaded from vessels onto a series of conveyor belts that moved the gypsum to the employer’s “rock shed” at its production plant. Id. at 1054-55. From the rock shed, the gypsum was processed and then transported to the sheetrock production department. Id. The finished product was eventually transported to market by truck. Id. The employee in Bianco sustained an injury in the sheetrock production department Id. During the course of his employment, the employee participated in both the production and the unloading process. Id.
Relying in part on the principles contained in Winchester, the Eleventh Circuit held that the sheetrock production department where the injury occurred did not satisfy the situs test.[7] Id. at 1058. Because this area was used solely for manufacturing sheetrock and was not part of the “on-going overall process of unloading raw gypsum,” the Eleventh Circuit concluded that it was functionally distinct from the unloading area contained in the same facility. Id. Significantly, the Eleventh Circuit responded to the employee’s argument that “[because] a portion of the [employer’s] facility is maritime, the entire facility must be, because to hold otherwise would result in workers walking in and out of coverage.” Id. at 1059. Based on the Supreme Court’s statements in Schwalb[8] and Herb’s Welding, the Eleventh Circuit determined that this principle “was more concerned with workers engaged in maritime activity walking in and out of coverage at or near the water’s edge.” Id. Most importantly, the Eleventh Circuit noted that congressional intent that workers not walk in and out of coverage “does not give a court the license to reach out and expand coverage beyond the terms of [33 U.S.C. § 903(a)].” Id. at 1060.
*451 Like the Eleventh Circuit in Bianco, I believe that the majority’s expansive definition of covered situs “would effectively be writing out of the statute the requirement that the adjoining area ‘be customarily used by an employer in loading ... a vessel.’ ” Id. “[The] broad interpretation of ‘area’ [contained in Winchester] is different from one that ignores other language in the statute indicating that afunc-tional nexus to maritime activity must nonetheless exist.” Id. at 1060 n. 10 (emphasis in original).
This case is distinguishable from the facts of Caputo, where one employee was injured on a pier while stripping containerized cargo and another employee was injured on an adjoining area while loading cargo from a vessel onto a truck. Ne. Marine Terminal Co. v. Caputo, 432 U.S. 249, 253, 255, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). It is also distinguishable from the facts of Winchester, where the injury occurred in a “gear room” that contained “equipment used by stevedores to perform the loading operation.”[9] 632 F.2d at 507 & n. 1. The production platform in this case has a functional nexus to oil and gas production, not to the loading of cargo.
I disagree with the majority’s invocation of the “walking in and out of coverage” principle to justify its situs holding. First, the Supreme Court stated in Herb’s Welding that “there will always be a boundary to coverage, and there will always be people who cross it during their employment.” 470 U.S. at 426, 105 S.Ct. 1421; see also Bianco, 304 F.3d at 1059-60. In Jones, Melerine, and Dickerson, the BRB recognized that those employees spent at least some of their time performing maritime work on a covered situs; however, the employees were unable to establish that they were located on a covered situs at the approximate time they were injured. See Thibodeaux, 370 F.3d at 488. Second, I believe that the text of § 903(a) is not ambiguous regarding whether the production platform is a covered situs. The production platform was not “customarily used by an employer in loading ... a vessel.” See 33 U.S.C. § 903(a). “The starting point in discerning congressional intent is the existing statutory text.” Lamie v. United States Tr., 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history. Carrieri v. Jobs.com, Inc., 393 F.3d 508, 518-19 (5th Cir.2004). Third, even assuming that this principle should guide our situs analysis, the facts of this case do not present the situation that Congress sought to eliminate with the 1972 amendments to the LHWCA. In support of this argument, the majority cites to Caputo and Winchester, which I have previously demonstrated are factually distinguishable from this case. The “walking in and out of coverage” principle reflects Congress’s “undoubted desire to treat equally all workers engaged in loading or unloading a ship, *452 whether they were injured on the ship or on an adjoining pier or dock.” Herb’s Welding, 470 U.S. at 426, 105 S.Ct. 1421; see also Sidwell v. Express Container Servs., Inc., 71 F.3d 1134, 1135 (4th Cir.1995). This principle merely reminds us that Hudson would have been covered if he were injured on the loading barge, the transport barge, or the walkboard in-between. All three of these locations would qualify as a maritime situs under the LHWCA. The majority makes an unwarranted logical leap when it relies on this principle to transform a non-maritime oil and gas production platform into a covered situs. Hudson “is a far cry from the paradigmatic longshoreman who walked in and out of coverage during his workday and spent substantial amounts of his time ‘on navigable waters.’” Herb’s Welding, 470 U.S. at 427 n. 13, 105 S.Ct. 1421.
VIII.
The regulation of oil and gas production in state territorial waters has traditionally been an area of state concern. This is not a case where Hudson would be left without a remedy if the LHWCA does not apply. Hudson was injured while performing a job required at many land-based oil and gas production sites located throughout Louisiana, and he is currently receiving state worker’s compensation benefits. There is ample precedent supporting the conclusion that the production platform where Hudson was injured was not a covered situs. If there is any doubt as to whether the LHWCA applies in this case, I believe that principles of federalism counsel towards a more conservative approach. The majority and dissenting opinions from our en banc decision in Bien-venu underscore the difficulties arising from application of the LHWCA to the oil and gas production industry based in state territorial waters. The additional ambiguity injected by the majority into this area of law “is plainly in conflict with the policy favoring expeditious but limited compensation to injured workers, that underlies all programs of workers’ compensation, whether at the federal or state level.” Bienvenu v. Texaco, Inc., 164 F.3d 901, 923 (5th Cir.1999) (en banc) (DeMoss, J., dissenting). For these reasons, I respectfully dissent.

. The panel is bound by Winchester's holding that the BRB’s situs determination is a question of fact that we review under the substantial evidence standard. See Winchester, 632 F.2d at 515. When the material facts are undisputed, as they are in this case, I believe that the BRB's situs determination should be reviewed under the de novo standard reserved for questions of law. See B&D Contracting v. Pearley, 548 F.3d 338, 340 (5th Cir.2008). Perhaps the en banc court will have an opportunity to revisit this issue in the future. Nevertheless, even under the more deferential substantial evidence standard, the record does not contain more than a scintilla of evidence that the production platform where Hudson was injured was "customarily used for significant maritime activity.” See Dir., OWCP v. Ingalls Shipbuilding, Inc., 125 F.3d 303, 305 (5th Cir.1997).

. The geographical nexus prong of the situs test focuses on the production platform’s geographical nexus with navigable waters. In contrast, the fact that the production platform is "geographically separate” from the loading barge is relevant to the functional nexus inquiry-

. "Function” is defined as "the action for which a ... thing is specially fitted, used, ... or for which a thing exists.” Webster’s Third New International Dictionary 920 (16th ed.1971). The function of the satellite wells and the platform is to produce marketable crude oil. The function of the loading barge is to transport that crude oil in maritime commerce. Only the latter function occurs on a LHWCA situs.

. In support of its argument that the production platform qualifies as an "adjoining area,” the majority repeatedly refers to loading activities that occurred on the Cherokee.

. Winchester and Thibodeaux suggest that the satellite wells (where extraction occurred) and the production platform (where separation occurred) constitute a single functional entity.

. At most, Gavranovic stands for the proposition that an interconnected cargo storage facility qualifies as a covered situs if it is distinct from the production facility, adjoins *449 navigable waters, and contains some cargo awaiting transport by vessel. To that extent, it is relevant to the situs designation of the Cherokee, not the production platform.

. The Eleventh Circuit has adopted all Fifth Circuit decisions issued before October 1, 1981, including Winchester, as binding precedent. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). Because the Eleventh Circuit relied on Winchester when it applied the apportionment principle in Bianco, I find its reasoning particularly persuasive.

. Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989).

. Unlike the production platform where Hudson was injured, the "gear room” where Winchester was injured was an essential part of the loading and unloading process:
[Winchester's] duties as a gear man included supplying and repairing the tools and machinery used by stevedores in loading and unloading ships. His work was performed at the dockside, on board ships, and at each of the gear rooms, including those of other stevedores. When Texports was loading and unloading cargo, Winchester would service several ships, travelling over the public streets connecting the gear rooms and docks. Even when Texports had no ships to load or unload, the gear rooms operated repairing and maintaining gear for the next loading and unloading operation.
Winchester, 632 F.2d at 507.